IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES LEE McCLAIN                                                    PLAINTIFF

              v.                        Civil No.  13-5269

DR. W. HOWARD; DR. N. MULLINS;
NURSE RHONDA BRADLEY; NURSE
RHONDA MESCHEDE; and DEPUTY
D. CARTER                                                         DEFENDANTS


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

        This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

        The Plaintiff is incarcerated in the Ouachita River Unit of the Arkansas Department of

Correction.  Plaintiff's claims in this action concern his confinement at the Washington County

Detention Center (WCDC).  Plaintiff maintains he was denied adequate medical care by the

WCDC medical staff. With respect to Deputy Carter, Plaintiff claims that on one occasion he

gave the Plaintiff another inmate's medication.

        A hearing was held on March 18, 2015, on Defendants' first Motion for Summary

Judgment (Doc. 19).  At the conclusion of the hearing, Defendants withdrew their first Motion

for Summary Judgment (Doc. 19) and were given time to file a new motion.

        Defendants filed their Second Motion for Summary Judgment (Doc. 37).  A hearing on

the Motion was held on June 22, 2015, to allow the Plaintiff to respond to the Motion.  Plaintiff

was advised that the Court would consider his testimony from the March 18th hearing and that

AO72A
(Rev. 8/82)

he need only present whatever additional testimony or exhibits he felt were needed in light of the second Motion for Summary Judgment.

At the conclusion of the June 22nd hearing, it was determined that additional information was necessary.   A subpoena was issued for Plaintiff's medical records from Washington Regional Medical Center.   Defendants were also directed to make available certain records to the Plaintiff and to be present for a supplemental hearing held on  July 21, 2015.   At the conclusion of the July 21st hearing, the matter was taken under advisement.   The Summary Judgment Motion is now ready for decision.

### 1.  Background

The periods of incarceration involved in this case are from March 12, 2013, to April 16, 2013, and from September 7, 2013, until December 4, 2013.   With respect to the Medical Defendants, Dr. W. Howard, Dr. N. Mullins, Nurse Rhonda Bradley, and Nurse Rhonda Meschede, the Plaintiff contends they: (1) wrongfully changed his prescription for blood thinner from Coumadin (Warfarin) to Plavix; (2) wrongfully obtained his medical records; (3) allowed untrained deputies to pass out medication; (4) failed to provide him the Coumadin on a consistent basis; and (5) Nurse Bradley called him stupid for not having been on an aspirin regimen.   With respect to Deputy Carter, Plaintiff claims that Deputy Carter on one occasion gave him Amitriptyline which was prescribed to another inmate, Zachary McCain.

AO72A
(Rev. 8/82)

**Plaintiff's Testimony**

Plaintiff testified that he had been on Coumadin for a number of years due to a history of blood clots, a pulmonary embolism, and deep vein thrombosis. He had an inferior vena cava (IVC) filter[1] implanted to filter or stop blood clots.

Plaintiff testified that at the WCDC, he initially began receiving the Coumadin but the provision of it was somewhat sporadic. There were days, sometimes weeks, when he was not provided Coumadin. The longest period of time Plaintiff went without Coumadin was a week, but he testified this happened on three or four occasions. Plaintiff believed the stopping and starting of the medication was dangerous--it could make the medication not work properly. Plaintiff testified that if he did not get the Coumadin, his vision would get blurry, blood clots would start forming in his legs causing open sores, swelling of his legs and feet, and on one occasion he contracted staph infection. He further testified that he would sometimes cough blood, see blood in his stool, and have chest and leg pain.

Plaintiff testified when his blood had to be tested, he would have to go a day without having the Coumadin. However, as soon as the blood test was done, Plaintiff believed he should have been given the Coumadin.

Plaintiff testified that when he did not receive his medication, he would ask the floor officer to contact the nurse and would also put in a grievance or request about it. Plaintiff stated that when he did put in a grievance or request, it was ignored most of the time, but sometimes he would begin receiving the medication again.

---

[1]The inferior vena cava filter is implanted just below the kidneys. The inferior vena cava is the large vein that takes blood back to the heart and lungs. http://surgery.med.umich.edu/vascular/patient/treatments/ivc_filters.shtml (accessed September 8, 2015).

-3-

**Changing to Plavix**

Plaintiff testified that, after seeing the doctor one day, his blood thinner was changed to Plavix.  Plaintiff testified that the doctor did not say why he was changing the medication or explain the possible side effects.  Plaintiff initially refused to take the Plavix and asked to be placed back on Coumadin.  After awhile, Plaintiff began taking the Plavix.  According to Plaintiff, the Plavix made him light headed and dizzy.  He also testified he had bleeding problems, nausea, chest pains, swelling, and leg problems.

Plaintiff testified that during this time period he was taken to both Washington Regional Medical Center and Northwest Medical in Springdale.  He testified he was seen at both hospitals as a result of the complications he was suffering from being on Plavix.  Plaintiff testified that he still has blurred vision and chest pain at times.

**Medication Records**

Plaintiff testified that on the medication administration records (MARs) jail staff would write an "R" in the box standing for refused if for any reason he did not get his medication including being out to court.  The MAR for March of 2013 indicates that Plaintiff began receiving Coumadin in the morning on March 15th, three days after his being booked in, through March 23rd.  However, from March 16th to March 19th, it appears that there is an "R" written by the Plaintiff's initials.  Id.  Plaintiff testified that he could not recall if he had received his medication on those days but it looked to him like the MAR had been altered.  Additionally, on March 20th, there is a "R" in the box where the Plaintiff's initials should be.  Id.

On March 24th, Plaintiff began receiving his Coumadin at noon.  Defts' Ex. 2(b), Doc. 39-9 at Pg. Identification (ID) No. 455.  On March 25th and 26th there are no entries indicating

the Plaintiff received Coumadin at noon.  Id.  There is an entry in the a.m. on March 26th but it was crossed out.  Id.

From the MAR, it appears Plaintiff did not receive his Coumadin on March 12th to March 14th, March 20th, and March 25th.  It is not clear from the MAR whether he received his Coumadin on March 16th through the 19th or on March 26th.  While he could not recall specifically, Plaintiff  indicated that he believed he had only missed his medication on three or four days in March.

The MAR for April of 2013 indicates Plaintiff received Coumadin at noon on April 1st and 2nd.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 460.   Plaintiff was then prescribed Clopidogrel (a generic form of Plavix) 75 mg. by Dr. Howard.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID. No. 459.  The record begins at April 4th and contains a "R" in each box through April 9th.  Id.  These boxes do not contain the Plaintiff's initials.  From April 10th to April 16th, with the exception of April 14th which appears to contain a "R," Plaintiff initialed the MARs' record as having received this medication.  Id.  He was not offered medication on April 3rd.  Plaintiff testified that he did refuse the medication from April 4th to April 9th.

The MAR for September of 2013 indicates Plaintiff did not receive Coumadin from September 7th through September 15th.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 473.   From September 16th through September 30th a "R" appears in each box.  Id.  Plaintiff testified that he did not receive Coumadin in the month of September.

On October 18th, Plaintiff submitted a written grievance saying he had not received his Coumadin in weeks.  He testified that prior to submitting the written grievance, he asked the floor deputy and the nurse about his medication.

AO72A
(Rev. 8/82)

The MAR for October of 2013 indicated Plaintiff was not offered Coumadin on October 13th through the 17th.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 477.  From October 1st to October 11th, a "R" is written in each day's box.  Id.  On October 12th, it appears the entry is crossed out.  Id.  From October 18th to the 31st, with the exception of October 20th and 21st which appear to have "R" written in each box, the medication was provided to the Plaintiff.  Id.  Plaintiff testified that he started putting plus signs or crosses in the box indicating he received the medication rather than his initials.

The MAR for November of 2013 indicates that, with the exception of November 7th that has a "R" written in the box, it appears that Plaintiff received Coumadin each day.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 484.  Plaintiff testified that he had put in the plus signs or crosses indicating he had received the medication.   He questioned whether he had received the medication on the 14th, 15th, and 26th, because the "markings" on those days looked questionable.

The MAR for December of 2013 indicates Plaintiff did not receive his Coumadin on December 1st or 2nd but did receive it on December 3rd.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 487.  Plaintiff was released from the jail on December 4th.  It is not clear from the MAR whether Plaintiff received the Coumadin prior to his release.

**Administration of the Wrong Medication**

Plaintiff testified that on one morning in March,[2] Deputy Carter was distributing medications and called the Plaintiff's name.  At the time, Plaintiff had been sleeping.  Plaintiff took the medication but then saw it was not his name on the medication sheet.  Plaintiff testified

---

[2]It was determined that the date in question was March 25, 2013.

-6-

that his throat started burning as the medication went down his throat. Plaintiff asked Deputy Carter if he gave the Plaintiff the wrong medication, Deputy Carter responded that he had. Plaintiff received Amitriptyline prescribed to Zachary McCain. After putting in several requests, Plaintiff was seen by the doctor after he took this medication.

Plaintiff testified he suffered side effects from the medication, including burning in his throat and stomach, blood in his stool, coughing up blood, chest pains, and shortness of breath. Plaintiff testified that these side effects lasted for weeks. Plaintiff testified that on one other occasion, Deputy Carter attempted to give him another inmate's medication; however, Plaintiff made sure he did not take the wrong medication again.

### Alleged Illegal Obtaining of Medical Records

Plaintiff testified that Defendants obtained his medical records from Iowa illegally. While he signed the release, Plaintiff said he wrote on the form that he was doing so under duress. Plaintiff felt like he was forced to sign the release. Plaintiff testified they joked that they had gotten the medical records despite his putting "under duress" on the form.

The records at issue are those from the Jennie Edmundson Hospital in Council Bluffs, Iowa. See Defts' Ex. 2(b), Docs. 39-6 to 39-8 at Pg. ID Nos. 341-403. The records deal with the admissions of the Plaintiff in 2010. On January 2, 2010, Plaintiff was admitted through the emergency room complaining of lower extremity edema and tenderness. Id. at Pg. ID No. 341. He remained hospitalized there until February 3, 2010. Id. His primary diagnosis was multiple pulmonary emboli. Id. His secondary diagnoses were: deep vein thrombosis, tobacco abuse, depression with anxiety, personality disorder, and negative work-up for clotting disorder. Id. The IVC filter was placed. Id.

Plaintiff was admitted again on February 22, 2010, complaining of lower extremity edema and pain and was discharged on February 27, 2010.  <u>Defts' Ex. 2(b), Doc. 39-7 at Pg. ID No. 361.</u>  A lower extremity Doppler study showed "clot progression now extending from the ankle clear up to the inferior vena cava filter but not above."  <u>Id.</u>  Plaintiff was put on Coumadin and instructed on the need for close monitoring.  <u>Id. at Pg. ID No. 362.</u>

On March 3, 2010, Plaintiff was seen at the emergency room complaining of blood in his stools and a bloody nose.  <u>Defts' Ex. 2(b), Doc. 39-8 at Pg. ID Nos. 394-403.</u>  Blood tests and chest x-rays were performed.

Plaintiff was seen in the emergency room on August 18, 2010, complaining of chest pain. <u>Defts' Ex. 2(b), Doc. 39-7 at Pg. ID No. 380.</u>  Blood tests, chest x-rays, and an electrocardiogram (EKG) were performed.  <u>Id. at Doc. 39-7 at Pg. ID Nos. 380-385.</u>   A 24-hour Holter monitor test was also done and showed no sustained atrial or ventricular arrhythmia.  <u>Id. at Doc. 39-8 at Pg. ID No. 389.</u>

### Distribution of Medication by Deputies

Plaintiff believes that the custom or policy of the WCDC allowing deputies to dispense medication is unconstitutional.  He points out the deputies are not trained medically and have no idea of the possible side effects of medication that is being distributed.

### Records from Washington Regional Medical Center

These records are being labeled as Court's Exhibit 1 and will be filed as part of the record.  The records indicate Plaintiff was seen on March 30, 2013, for complaints of rectal bleeding.  He was diagnosed with an anal fissure.  He was advised to continue taking Coumadin every day and if the bleeding with bowel movements had not cleared up in two weeks, he should

-8-

be rechecked.  He was advised to apply Silvadene to the areas on his legs twice a day.  He was prescribed Tramadol and released to be transported back to jail.  Court's Ex. 1 at pgs. 3-7.

**Dr. Howard's Testimony**

Dr. Howard testified that he was employed as a jail physician at the WCDC between March and December of 2013.  He testified that he reviewed an inmate's prescriptions in light of the inmate's complaints.  He did not review an inmate's medication each time he saw the inmate.

Dr. Howard testified that he was never present when medication was dispensed.  He testified that if there was a problem with medication distribution, it would be brought to his attention by the nurses.

Dr. Howard testified that Coumadin was used to regulate the clotting mechanism.  He further stated that the IVC filter went into a large blood vessel and was designed to reduce blood clots.

On March 12, 2013, when Plaintiff was booked into the jail, he indicated he was on Coumadin.  Dr. Howard testified he usually "went along" with current medications if the prescriptions were from a reputable source.  Dr. Howard noted that he was called on March 14th and authorized the Coumadin for the time being and ordered a blood test to be done on Monday.  Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 328.  Dr. Howard testified the blood test, a prothrombin time test (PT), measured how quickly the blood clotted and gives you a measure of how well a medication, such as Coumadin, is working.  He stated that there was a therapeutic range for the Coumadin.  Dr. Howard testified that based on Plaintiff's PT results on March 25th, he would

-9-

not have changed the Plaintiff's prescription unless he was having complications.  Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 335.[3]

On March 20th, Dr. Howard was contacted by phone by Nurse Bradley.  Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 329.  Plaintiff was bleeding and it was noted he was on Coumadin.  Id. Dr. Howard indicated the Plaintiff should be sent to the emergency room for evaluation.  Id.

On March 25th, a PT/INR test was done on the Plaintiff at the Washington Regional Medical Center.  Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 335.  On March 26th, Plaintiff was seen by Dr. Howard.  Plaintiff had been placed on doctor call for a post-check from the hospital and blood tests.  Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 336.  When Plaintiff was seen on the 26th, he complained of having been given the Amitriptyline by Deputy Carter.  Id.

Dr. Howard testified that Plaintiff complained of chest discomfort but his blood pressure was normal and his oxygen level was good.  However, Dr. Howard believed the Plaintiff, who was uncooperative and upset, was having some anxiety. Dr. Howard testified that Amitriptyline was a mild tranquilizer and did not harm the Plaintiff.  Plaintiff was put into an isolation cell and on a fifteen minute safety check until April 4th.  See Defts' Ex. 2(b), Doc. 39-9 at Pg. ID Nos. 446-454.

Dr. Howard testified that on April 2nd, he received a call from one of the nurses advising him that Plaintiff's PT was higher than it had been.  Dr. Howard testified that the INR was also higher than he would like, although neither was what he would consider seriously elevated.  Dr.

---

[3] The test results contain both a result for a PT and an INR.  The international normalized ratio (INR) is a "formula that adjusts for the differences in chemicals used in different laboratories so that test results can be comparable." http://www.mayoclinic.org/tests-procedures/prothrombin-time/basics/results/prc-20013300 (accessed Sept. 9, 2015).

-10-

Howard discontinued the Coumadin and ordered the Plaintiff to start receiving Plavix as of April 4th.  Dr. Howard indicated that blood testing was not required with Plavix.

Dr. Howard testified that he was advised of the fact that Plaintiff was refusing to take the Plavix.  Dr. Howard testified that because of Plaintiff's unresponsiveness and hostility he allowed the Plaintiff to go back on Coumadin.

Dr. Howard testified that he saw the Plaintiff on October 1st.  Plaintiff had been in a fight and was aching all over.  Plaintiff requested something for pain.  Dr. Howard testified that when he said he would authorize Tylenol for the pain the Plaintiff got mad and walked out.  Dr. Howard testified that Tylenol was not a blood thinner and would have no harmful interaction with the Coumadin.  Dr. Howard believed Plaintiff was on Coumadin at the time but is not positive.  See Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 466.  He ordered a PT test.  Id.  Dr. Howard testified he had no records indicating when the Plaintiff was booked back into the WCDC.

Dr. Howard testified that the MAR for September showed that the Plaintiff did not receive Coumadin for the first eight days he was incarcerated.  See Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 473.  The prescription was issued on the 14th and Plaintiff started receiving it on September 16th.  Id.  Dr. Howard had no concerns that Plaintiff would suffer a stroke or heart attack from a clot.  Dr. Howard testified that Coumadin remains in your blood stream for several days.  If a few doses were missed, the patient could be started right back on the Coumadin.  Dr. Howard testified there was no long term effect on Plaintiff as a result of missing his Coumadin doses for a period of eight to ten days.

-11-

Dr. Howard testified he next saw the Plaintiff on October 29th.  See Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 470.  Coumadin was not mentioned during this visit.  The Plaintiff had a stasis ulcer on his right leg.  Dr. Howard prescribed an antibiotic, ciprofloxacin, and advised the Plaintiff to keep his foot elevated as much as possible.  Dr. Howard testified he had no concerns about the interaction of the antibiotic and Coumadin.   In Dr. Howard's opinion, the ulcer was not caused by Coumadin or clotting.  Instead, Dr. Howard testified the ulcer could have resulted from a bruise or from poor circulation.

Dr. Howard next saw the Plaintiff on November 19th for the same condition.  See Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 471.  Dr. Howard testified that Plaintiff's condition was improving but that he wanted Plaintiff off his feet as much as possible.  Dr. Howard prescribed Aleve for pain.  Plaintiff did not raise any issues regarding his Coumadin prescription.

**Dr. Mullins' Testimony**

Dr. Mullins testified that he was employed by the WCDC in 2013.  He saw the Plaintiff on two occasions. The first occasion was on October 22nd.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 467.  Plaintiff had a healed stasis ulcer and requested Silvadene.  Plaintiff also requested something for depression and Dr. Mullins prescribed Prozac.  Dr. Mullins testified that the Plaintiff had poor circulation to his right knee and he prescribed a TED stocking.  Dr. Mullins testified that the poor circulation was not related to the Coumadin.  Plaintiff voiced no complaints regarding the Coumadin.

Dr. Mullins next saw the Plaintiff on December 3rd.  Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 471.  Plaintiff was complaining of blood on his rectum when he wiped.  Dr. Mullins performed a rectal examination and noted no external hemorrhoids, no lesions, and no blood.

-12-

When Dr. Mullins attempted to perform an internal examination, the Plaintiff refused to cooperate. Plaintiff also complained that he was coughing up "green stuff." Dr. Mullins testified the Plaintiff's lungs were clear. Sinus medication was prescribed. In Dr. Mullins' opinion, a single dose of Amitriptyline would have no effect. However, Dr. Mullins conceded that he had no experience with a Coumadin patient being given Amitriptyline. Dr. Mullins also testified that eight to ten days without Coumadin would have no long term effect; although, in the short term, it would make the Plaintiff more likely to form clots.

### Nurse Rhonda Bradley's Testimony

Nurse Bradley testified that she worked full time for the WCDC in 2013. She testified that a medical questionnaire is completed at booking. Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 463. Once completed, the questionnaire is sent to the medical department.

Nurse Bradley testified that if an inmate came into the WCDC with a current prescription and the pills could be identified as the correct medication, the doctor is called and usually the inmate is continued on the medication. If an inmate had been in the jail within the last seven to eight months and was still on the same medication, he would be continued on the medication.

Nurse Bradley testified that she first saw the Plaintiff on March 14th. Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 327. Plaintiff advised Nurse Bradley that he was on Coumadin and had last taken it two days ago.[4] Nurse Bradley saw Plaintiff later that day after Nurse Vickery had received Dr. Howard's approval to continue the Plaintiff's Coumadin prescription. Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 328.

---

[4] As noted above, Plaintiff was booked in on March 12, 2013.

-13-

Nurse Bradley testified that on March 20th, Plaintiff was complaining of bright red bleeding.  He was on Coumadin at the time.  Defts' Ex. 2(b), Doc. 39-6 at Pg. ID No. 329.  Dr. Howard was called and it was determined Plaintiff should be sent to the emergency room.  Id. Plaintiff was seen at the emergency room and discharged with instructions to stay on Coumadin. Id. at 331.  If the bleeding with bowel movements had not cleared up within two weeks, instructions were given that he should be rechecked.  Id. at pgs. 331.  Plaintiff was also given a prescription for Tramadol.  Id. at 332.

Nurse Bradley testified that Plaintiff was seen by Dr. Howard on March 26th.  Dr. Howard wanted to see the Plaintiff's records regarding his history of taking, or need for, Coumadin.  Nurse Bradley testified she spoke with the Plaintiff and then faxed a release he had signed to the Jenny Edmundson Hospital.

Nurse Bradley had no recollection of Plaintiff having been given a single dose of Amitriptyline.  However, as Plaintiff pointed out, the written exhibits indicate she spoke with Plaintiff about this issue on March 25th.  See Defts' Ex. 2(c), Doc. 39-12 at Pg. ID No. 500.

Nurse Bradley testified that the MARs were generated by the nurses on the computer. She testified that she generated the initial Coumadin MAR.  Once generated, the forms are put in a notebook that the officers carried on the medication chart.  She testified that there is a separate MAR for each medication an inmate takes.  On the MAR, the first line contains the day of the month.  The second line is for the badge number and initials of the deputies while the third line is for the detainee to put his initials.  If an inmate refused the medication, either a capital R or the letters REF were to be written on the line for the detainee's initials.  Nurse Bradley testified a R was also used if an inmate was not present when the deputies passed out the

-14-

medications.  A mark where the detainee's initials were to be written had no official meaning to Nurse Bradley.  Each page contains four sets of lines presumably for morning, lunch time, supper time, and bedtime.  The MARs are divided by cell block.

The medications are in a bubble pack called a card.  Each card has the detainee's name on it and what prescription medication it contained.  The bubble pack for the correct date would be punched.  Nurse Bradley testified that at that time the WCDC used Southgate Pharmacy for prescription medications.  Nurse Bradley testified that the initials OTC stand for over the counter medication.

Nurse Bradley testified the March MAR indicates there were times when Plaintiff refused the Coumadin.  Defts' Ex. 2(b), Doc. 39-9 Pg. ID No. 455.  The nurses were sometimes notified when a detainee refused his medication.  Nurse Bradley testified that she could not recall any problems with the Plaintiff's medication.

On March 19th, Plaintiff submitted a grievance stating that he was being given his Coumadin in the morning but believed it should be given at the same time everyday, which he believed should be the noon medication call.  Defts' Ex. 2(c), Doc. 39-12 at Pg. ID No. 497. Nurse Bradley responded that his medication was "scheduled for am and that is when it will be given."  Id.  According to Nurse Bradley, the a.m. medication distribution was the biggest of the day.  She testified that a medication given in the a.m. daily was given consistently.

On April 7th, Plaintiff submitted a grievance stating that he was refusing all medical treatment because he did not trust the staff administering the medication and believed he was being charged multiple times for the same issues.  Nurse Bradley responded that his "medical condition requires medication and the Nurses and Dr. at WCDC have addressed [his] condition

-15-

as well as [his] meds.  The last Dr. [v]isits were related to [his] Coum[a]din." Defts' Ex. 2(c), Doc. 39-12 at Pg. ID No. 506.  Later that same day, Plaintiff submitted a second grievance in which he stated: "DO NOT REFILL ANY MORE PRESCRIPTIONS I AM REFUSING ALL MEDICATIONS AND VISITS FROM THE ENTIRE MEDICAL STAFF." Id. at 507.  Plaintiff continued to request his money back because he said he was not taking the medication.  Id. at pgs. 508-09.

On the medical questionnaire completed on September 7, 2013, when Plaintiff was booked in for the second time, Plaintiff indicated he had been taking Coumadin and hydrocodone. Defts' Ex. 2(b), Doc. 39-10 at Pg. ID No. 463.  Jail records indicate Plaintiff was not given a prescription for Coumadin until September 14th.  Defts' Supplemental Ex. 1, Doc. 52-1 at Pg. ID No. 651.  Nurse Bradley testified that it appeared the Plaintiff had been seen by Nurse Vickery because Ibuprofen was also added.  Id. at 656.

Nurse Bradley could not explain why he was not started on Coumadin until the 15th.  If she had seen the medical questionnaire, she testified she would have put the Plaintiff on Coumadin.  Without having seen the questionnaire, she testified she had no reason to know he was not receiving his medication.

**Nurse Rhonda Meschede's Testimony**

Nurse Meschede testified that in 2013 she was employed full-time at the WCDC.  She recalled the Plaintiff being non-compliant with medication that had been ordered for him.  Nurse Meschede testified that if she had any problems with a detainee, she would document it on the chart or in a response to her grievances.

-16-

### 2. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id.</u> (citing, <u>Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." <u>Crooks v. Nix</u>, 872 F.2d 800, 804 (8th Cir. 1989)(<u>citing Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976)). The Eighth Amendment deliberate indifference standard applies to all denial of medical care claims. <u>Carpenter v. Gage</u>, 686 F.3d 644, 650 (8th Cir. 2012). The deliberate indifference standard has both an objective and a subjective component. <u>Coleman v. Rahija</u>, 114 F.3d 778, 784 (8th Cir. 1997).

-17-

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Jones v. Minnesota Dep't of Corrections, 512 F.3d 478, 481 (8th Cir. 2008)(internal quotation marks and citation omitted).

To prevail on his claim, Plaintiff must demonstrate that (1) he suffered an objectively serious medical need; and (2) the defendant actually knew of the medical need but, subjectively, was deliberately indifferent to it. Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006). "Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011)(internal quotation marks and citation omitted). The deliberate indifference standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment. Vaughn v. Gray, 557 F.3d 904, 908-09 (8th Cir. 2009). Nor is the standard met by demonstrating a doctor committed medical malpractice. Jackson v. Buckman, 756 F.3d 1060, 1065-66 (8th Cir. 2014).

First, Plaintiff's claim based on the fact that medically trained personnel do not pass out the medication fails. This does not state a claim of constitutional dimension. See e.g., Griggs v. Livermore, No. 13-5133, 2014 WL 979197 (W.D. Ark. March 13, 2014)("There is no constitutional requirement that medication be disbursed only by trained medical personnel"); Booker v. Herman, 2006 WL 2457230, *5 (N.D. Ind. Aug. 22, 2006)("While it might be a good practice, tradition, or even state law to require that only medical staff can deliver medication, the

-18-

Constitution does not prohibit guards from distributing medication to inmates.  This allegation states no claim upon which relief can be granted").

Second, Plaintiff's claim against Deputy Carter fails because no constitutional violation occurred.   The facts do not support a finding that Deputy Carter acted with deliberate indifference.  Rather, at most, the facts support a finding of negligence on Deputy Carter's part. Negligence does not support a constitutional claim.  See e.g., Farmer v. Brennan, 511 U.S. 825, 835 (1994)(simple or even heightened negligence insufficient to establish deliberate indifference); Crites v. Bunt, No. 14-cv-00540, 2014 WL 2738432, *6 (S.D. Ill. June 17, 2014)(Giving an inmate the wrong medication on a single occasion at most supports a finding that the officer was negligent).

Third, Plaintiff's claim based on Dr. Howard's changing his blood thinner from Coumadin to Plavix fails as a matter of law.  "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."  Dulany v. Carhahan, 132 F.3d 1234, 1239 (8th Cir. 1997). What medication should be prescribed clearly involves an exercise of professional judgment. See e.g., Besser v. Sepanek, No. 15-13, 2015 WL 4506958, *11 (E.D. Ky. July 23, 2015)(disagreement with the medication the doctors chose to prescribe in the exercise of their medical judgment does not amount to deliberate indifference); Hathorn v. Mullins, No. 14-5031, 2015 WL 1119984, *3 (W.D. Ark. March 12, 2015)("what medications should be prescribed involves the exercise of professional judgment and does not constitute deliberate indifference").

-19-

Fourth, no claim is stated against Dr. Howard or Dr. Mullins for the sporadic distribution of prescription medication.  The undisputed testimony was that the doctors played no role in the obtaining of the medication or its distribution.

Fifth, no claim of constitutional dimension is stated based on Nurse Bradley allegedly calling the Plaintiff stupid.  "Verbal threats do not constitute a constitutional violation." Martin v. Sargent, 780 F.2d 1334, 1339 (8th Cir. 1985).  Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension.  McDowell v. Jones, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); Martin, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); Black Spotted Horse v. Else, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). Cf. Burton v. Livingston, 791 F.2d 97, 100-101 (8th Cir. 1986)(A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death").

Sixth, no claim is stated regarding the alleged wrongful obtaining of the Plaintiff's medical records.  Plaintiff admits he signed the medical release authorizing Defendants to obtain these records.  While the Plaintiff claims he signed the release under duress and so noted below his signature, no constitutional violation is stated.  To the extent Plaintiff attempts to base his

-20-

claims in HIPAA, these claims fail because "HIPAA does not create a private right of action." Dodd v. Jones, 623 F.3d 563, 569 (8th Cir. 2010).

Finally, there are no genuine issues of material fact as to whether the nurses or doctors exhibited deliberate indifference to the Plaintiff's serious medical needs. With respect to his claim that he was not given his blood thinner medication on a consistent basis, the MARs indicate that, with respect to the first period of incarceration, Plaintiff began receiving the medication three days after being booked in. Plaintiff testified that there were only three or four days in March that he did not receive the medication. In early April, Plaintiff's prescription was changed to Plavix. Plaintiff refused to take the medication from April 4th to April 9th and on April 14th. Additionally, on April 7th, he wrote a grievance stating that he was refusing all medication. Thus with respect to the first incarceration, the majority of the periods of time when the Plaintiff did not receive his medication are due to his own actions in refusing the medication.

With respect to the second period of incarceration, the MARs indicated Plaintiff did not receive Coumadin from September 7th to September 15th. This delay was due to Nurse Vickery, who is not a named Defendant, not requesting approval for the Coumadin prescription sooner. From September 16th to October 11th, a "R" is entered on each day. The entry for October 12th is crossed out. On October 13th to 17th, Plaintiff was not offered Coumadin. On October 20th and 21st a "R" is entered for each day. In November, it appears the only day he was not offered medication was on November 7th; although, the Plaintiff did indicate he believed the entries on November 14th, 15th and 26th looked suspect as if they had been altered. In December, Plaintiff did not receive his medication for two days and then was released on the 4th. These lapses in medication, with the exception of the first eight days, do not appear to be due to any action on

-21-

the part of Nurse Bradley, Nurse Meschede, Dr. Howard, or Dr. Mullins.  Again, it appears that Plaintiff refused his medication on many days.

The MARs are inconsistent with the Plaintiff's testimony that he was not offered his blood thinner for as long as a week on three or four occasions.  While Plaintiff questioned whether the MARs had been altered, this is pure speculation and Plaintiff could not specifically testify as to the dates he received his medication, refused his medication, or was not offered his medication.

Furthermore, Plaintiff was sent to the hospital twice, referred to one or the other of the doctors on six separate occasions, and underwent blood tests to check whether the medication was at therapeutic levels.  This belies the existence of deliberate indifference on the part of the nurses or doctors.

Defendants also maintain they are entitled to qualified immunity.  Qualified immunity "is an *immunity from suit* rather than merely a defense to liability."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original).   It "is a means of protecting government officials from vexatious lawsuits questioning the discretionary performance of their duties."  Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989).

Analyzing a claim of qualified immunity requires a two-step inquiry.  Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).   "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation."  Robinson v. Payton, 791 F.3d 824, 828 (8th Cir. 2015).  "Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity."  Krout v.

-22-

Goemmer, 583 F.3d 557, 564 (8th Cir. 2009). At the summary judgment phase, a district court is required to view the genuinely disputed facts in the light most favorable to the non-moving party, provided the record does not so contradict the facts as to render so viewing them unacceptable to any reasonable juror. O'Neil v. City of Iowa City, 496 F.3d 915, 917 (8th Cir. 2007).

Clearly established law holds that "deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." Langford v. Norris, 614 F.3d 445, 461 (8th Cir. 2010)(internal quotation marks and citation omitted). However, the Court must do more than

> determine that the law was clearly established in the abstract. We must instead examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law. This is not to say that an official action is protected by qualified immunity unless the very action in question was previously held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

Id. (internal quotation marks and citations omitted).

With respect to Deputy Carter, I find he is protected by qualified immunity. No reasonable official would have known that mistakenly providing an inmate with the wrong medication on a single occasion would have violated the Eighth Amendment.

As discussed above, none of the Plaintiff's claims that the Medical Defendants, Dr. Howard, Dr. Mullins, Nurse Bradley, or Nurse Meschede, exhibited deliberate indifference to Plaintiff's serious medical needs survive summary judgment. No reasonable official, knowing all the relevant facts, would have known that their actions violated the law.

-23-

**4.  Conclusion**

I therefore recommend that Defendants' Motion for Summary Judgment (Doc. 37) be

**GRANTED** and this case dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of September 2015.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-24-